[No. A131120. First Dist., Div. One. July 14, 2011.]

LIFE TECHNOLOGIES CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
TIMOTHY H. JOYCE, Real Party in Interest.

**COUNSEL**

Payne & Fears, Rodney B. Sorensen and Daniel F. Lula for Petitioner.

Ungerman Law Offices, Elisa W. Ungerman and Kurt N. Strauss for Real Party in Interest.

## OPINION

**BANKE, J.—**

### I. INTRODUCTION

Real party in interest Timothy H. Joyce has sued petitioner Life Technologies Corporation (LTC) for wrongful termination, claiming, among other things, that he was discriminated against on the basis of his age and retaliated against because he complained about such discrimination. Joyce successfully moved to compel further answers to special interrogatories seeking detailed information about other employees/former employees. LTC seeks writ relief, contending the information ordered disclosed is irrelevant, unlikely to lead to admissible evidence and implicates significant privacy rights of the third party employees/former employees. It also contends the trial court failed to provide adequate procedural protections to the third parties before their private information is disclosed and failed to provide adequate protections for any such information once it is disclosed.

We conclude the trial court did not adequately consider, or provide procedural protections for, the substantial privacy interests of the third party employees/former employees. Accordingly, we will issue a peremptory writ directing the court to vacate its order compelling further answers to the challenged interrogatories and reconsider Joyce's motion in light of our opinion.

### II. BACKGROUND

Given the procedural posture of the case, our background recitation is largely derived from the allegations of Joyce's operative (first amended) complaint. We recognize LTC disputes all of Joyce's allegations of discrimination and retaliation.

Joyce is a patent attorney. In May 2007, he was hired by Applied Biosystems, Inc., then a wholly owned subsidiary of Applera Corporation, to manage the chemistry patent group within the intellectual property legal department. He drafted and filed patent applications and also managed the group. In February 2008, he was promoted to director of the molecular biology and chemistry group, and received an increase in compensation.

In May 2008, a planned merger between Applera and Invitrogen Corporation was announced. After the merger there would be an " 'excess capacity' of employees." Therefore, a "certain amount of employees" of Applied Biosystems would be let go over a two-year period.

In June 2008, Applera and Invitrogen entered into a "Merger Agreement," part of which included a "Special Severance Plan," which would apply to employees laid off because of and within two years of the merger. Employees who voluntarily resigned, died or became disabled, or were terminated for cause or as a result of a sale or transfer of a business group, would be ineligible for a severance package.

Around this time, Joyce consulted recruiters about future job opportunities. He was told Invitrogen had a pattern of acquiring companies, and then ridding itself of older employees and replacing them with younger new hires. Thereafter (Joyce does not allege when), he was told by his supervisor, Jeff Frazier, to "manage out" two over-40 female employees by "documenting them," i.e., by composing negative performance reviews. Joyce refused to do so, "preferring instead to manage in a positive fashion."

In September and October 2008, the Special Severance Plan was formally announced and publicized. Employees "were promised that if they stayed focused and working in their jobs and did not look for another job, take another job, or take the time to job hunt in lieu of performing their job duties, the company would provide the benefits of the 'Special Severance Plan' . . . in order to ease the 'financial impact on those who would be involuntarily terminated following the [merger/integration]' while '[helping] to alleviate both the negative effects [of the merger] on productivity due to the uncertainty during this 2 year transition period and the potential for economic hardship of affected employees.' " Joyce "accepted this offer and did not seek out new employment at this time, instead staying focused on his job as requested."

During this period of time, Joyce "noticed that he was being excluded from various opportunities that could have an impact on his selection for a position with the new company while younger employees were allowed these opportunities." He was also told by another employee that Frazier told her to warn Joyce "he should 'get ready to be documented.' " This same employee later told him she heard he was on a " 'hit list' for termination where performance issues would be fabricated and his work life made generally miserable in the hopes [he] would either voluntarily quit or 'documented cause' would be established for his termination, thereby justifying the denial of a severance package." He also heard the same thing from other directors and staff, and that the same strategy would be taken with two other over-40 employees, including one of the two women Frazier had asked him to "manage out." Joyce then went online to the United States Patent and Trademark Office Web site and observed almost all of the lawyers in the Invitrogen legal department had high registration numbers, "indicating that most were newly-minted attorneys, much younger than [he]."

At the end of September, Joyce met with Frazier and stated his concern about his potential termination "due to his age and being cheated out of his severance." Frazier "never denied what was occurring," and indicated he did not agree with decisions being made by Invitrogen's general counsel, but "there was nothing he could do."

In early October 2008, Joyce saw a copy of the new company's "IP legal department organization chart," and also saw his name on the layoff list on the chart. The list "appeared to confirm that many of those being laid off were over 40." Joyce spoke with Frazier about the chart and the "three people being 'managed out,' all of whom were over 40." Frazier did not deny there was such a document and told Joyce his concerns about age discrimination and being let go "were not going to help [him]." In late October, Joyce met with Frazier and the human resources senior manager, Wendy Van Bronkhorst, and expressed his concern about being let go. Frazier and Van Bronkhorst "fraudulently" told him there would be a position for him with the new company.

As the preparation for the merger continued, Joyce was "systematically stripped of duties and assigned menial tasks." He became the object of ridicule, and was eventually "demoted to a non-management position, in contrast to similarly situated younger employees." He also was subject to a litany of unreasonable demands by Frazier and, in turn, increasing "documentation," again in contrast to "other similarly situated younger employees." In addition, he was "forced" to dig up information about another of the over-40 employees on the layoff list to support a termination for cause "to avoid paying her a severance package."

The merger of Invitrogen and Applera took place on November 21, 2008, resulting in the creation of LTC.

On November 26, 2008, Joyce complained in writing to Van Bronkhorst that he was being subjected to age discrimination and also retaliation for his earlier informal complaints. Two days later, Joyce met with Van Bronkhorst, who denied any discrimination and said no investigation would be done. She also said there would be several rounds of layoffs, and "confirmed her understanding of Invitrogen's tendency to hire younger workers." The first round of layoffs occurred on or about December 10, 2008. Two of the three employees laid off were over the age of 40.[1]

---

[1] The record is not clear, but suggests these individuals were former employees of the Applied Biosystems's legal department and, specifically, the molecular biology and chemistry group. The record is also unclear or wholly silent in a number of other respects, including as to

In January 2009, the new organizational chart was made public, and Joyce did not have a position on it. His prior duties were reassigned to younger employees, and he was "effectively . . . demoted."

The following month, Joyce was put on a "performance improvement plan," the "last step in the plan to 'manage [him] out' " and "ostensibly provide grounds" to terminate him for cause and deny him a severance package. The asserted shortcomings in his performance were "petty, false and pretextual." Joyce wrote to the director of employee relations, Rosine Lawson, and asked for a full-fledged investigation into his age discrimination complaint.

On February 12, 2009, Joyce filed a complaint of age discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). On February 13, he met with Lawson about his internal complaint, and then began gathering information for her.

On March 9, 2009, Joyce was "let go" for "poor performance." He did not receive a severance package. Eleven of the 14 former employees of Applied Biosystems "laid off" as a result of the merger were over the age of 40.[2]

On March 16, he filed an additional complaint with the EEOC. His administrative complaints were consolidated, and the Department of Fair Employment and Housing issued a right-to-sue letter on April 2, 2009. The EEOC issued a right-to-sue letter on April 15, 2010.

Joyce filed the underlying action on May 3, 2010, and a first amended complaint on June 18, asserting causes of action for age discrimination (Gov. Code, § 12940, subd. (a) [disparate treatment]), a pattern and practice of age discrimination that included him (Gov. Code, § 12940, subd. (b) [disparate impact]), retaliation for his complaints of FEHA (California Fair Employment and Housing Act—Gov. Code, § 12900 et seq.) violations, as well as for breach of contract. He sues only on his own behalf.

The instant petition for writ of mandate arises from a discovery dispute, culminating in an order compelling answers to special interrogatories asking that LTC provide the following information:

(a) The names of all employees terminated during a two-year period, November 1, 2008, to June 28, 2010.

the total number of employees subject to the two-year reduction in force (RIF) company-wide, in California only, in the company's (or prior companies' legal departments), and in groups within the legal department(s).

[2] As noted, the record is unclear as to whether these 14 individuals were employed in Applied Biosystems's legal department, or a group within the legal department, or throughout the company.

(b) The department each worked for when terminated.

(c) The date of termination.

(d) The age of each at termination.

(e) The reason for termination.

(f) Whether severance benefits were offered.

(g) Whether offered severance benefits were accepted.

(h) A description of any offered severance benefits.

(i) A detailed explanation of reasons for any failure to offer severance benefits.

(j) The identity (including name, address and telephone number) of all former Applied Biosystems employees still employed by LTC after the RIF.

(k) Whether the terminated employees were former employees of Applera or Applied Biosystems.

LTC objected to the interrogatories on the grounds the information sought was irrelevant, not likely to lead to admissible evidence (Code Civ. Proc., § 2017.010; Evid. Code, § 210), and implicated the privacy rights of third parties.[3] (Cal. Const., art. I, § 1.)

The order compelling answers requires counsel for Joyce and LTC to "meet and confer, and to draft a notice letter to relevant California-based current employees/former employees to briefly inform them of the general nature of this lawsuit. The employees/former employees should be informed of the nature of the information that will be disclosed to the Plaintiff unless they file a motion for a protective order." The order places no restraint on the time and manner by which current and former employees may be contacted, nor does it contain safeguards maintaining the confidentiality of any information ultimately disclosed.[4]

---

[3] LTC also asserted the interrogatories potentially impacted hundreds of employees/former employees. Joyce then stated he would be satisfied with information for "California" employees/former employees, and the order compelling further answers was narrowed accordingly. The record is silent as to how many individuals are or were employed in-state.

[4] Although Joyce makes reference to protective order provisions, none are part of the record.

### III. Discussion

*Standard of Review*

We review the trial court's discovery order under the abuse of discretion standard. (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 371–372 [53 Cal.Rptr.3d 513, 150 P.3d 198] (*Pioneer Electronics*); *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736].) Accordingly, we may not substitute our view for that of the trial court unless there is no legal justification for the court's order. (*Alch v. Superior Court* (2008) 165 Cal.App.4th 1412, 1421 [82 Cal.Rptr.3d 470] (*Alch*).)

*Relevance*

*Nature of Claims*

LTC contends none of the information sought by the special interrogatories is relevant to Joyce's discrimination and retaliation claims, nor likely to lead to admissible evidence. (Code Civ. Proc., § 2017.010; Evid. Code, § 210.) LTC points out Joyce's suit is not a class action. It also points out the record does not indicate the third party employees/former employees about whom information is sought are percipient witnesses to the discrimination and retaliation Joyce claims to have experienced.

Joyce counters the information is necessary for him to develop a statistical analysis in support of his disparate treatment and disparate impact claims, emphasizing the latter claim. In addition, he "expects" the information may lead to evidence to prove his retaliation claim, as well as his claim for punitive damages.

■ Although LTC acknowledges Joyce has pled both disparate treatment and disparate impact claims, it contends Joyce has not demonstrated, and cannot demonstrate, the elements of a disparate impact claim. " 'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds. [Citations.] ■ Prohibited discrimination may also be found on a theory of 'disparate impact,' i.e., that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) LTC asserts Joyce has not identified "a specific, facially neutral employment practice or policy."

■ The record shows otherwise. Joyce is clearly challenging an RIF he claims was discriminatorily applied. This suffices as the predicate for a

disparate impact claim. (See *Pottenger v. Potlatch Corp.* (9th Cir. 2003) 329 F.3d 740, 749 [RIF "would constitute" a specific, outwardly neutral business practice]; *Schechner v. KPIX-TV* (N.D.Cal., Jan. 13, 2011, No. C 08-05049 MHP) 2011 WL 109144, p. *1 [disparate impact case based on RIF].) Furthermore, as we next discuss and contrary to LTC's apparent assumption, statistical evidence may be introduced in a disparate treatment, as well as a disparate impact, case.

*Statistical Evidence*

■ "Statistical proof is indispensable in a disparate impact case: ' "The plaintiff must begin by identifying the specific employment practice that is challenged." ' ' "Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." ' " (*Alch, supra*, 165 Cal.App.4th at p. 1428, quoting *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1323–1324 [19 Cal.Rptr.3d 519], quoting *Watson v. Fort Worth Bank & Trust* (1988) 487 U.S. 977, 994 [101 L.Ed.2d 827, 108 S.Ct. 2777]; see also *Paige v. California* (9th Cir. 2002) 291 F.3d 1141, 1145 (*Paige*) [statistical analysis "must show a disparity that is 'sufficiently substantial' as to 'raise such an inference of causation' "]; *Schechner v. KPIX-TV, supra*, 2011 WL 109144 at p. *2; *Stagi v. AMTRAK* (3d Cir. 2010) 391 Fed.Appx. 133, 137–140 ["a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance"].)

Thus, the critical comparison in a disparate impact case is "the group that 'enters' the [employment] process with the group that emerges from it." (*Paige, supra*, 291 F.3d at p. 1145.) " '[T]he best evidence of discriminatory impact is proof that an employment practice selects members of a protected class . . . in a proportion smaller than in the actual pool of eligible employees.' " (*Ibid.*, quoting *Moore v. Hughes Helicopters, Inc.* (9th Cir. 1983) 708 F.2d 475, 482.)

■ Statistical evidence may also be utilized in a disparate treatment case. However, because discriminatory intent must be shown in such a case, statistical evidence must meet a more exacting standard. "[T]o create an inference of intentional discrimination, statistics must demonstrate a significant disparity and must eliminate nondiscriminatory reasons for the apparent disparity. *Aragon[ v. Republic Silver State Disposal Inc.* (9th Cir. 2002) 292 F.3d 654, 663] (finding that statistics unsupported by other probative

evidence of discrimination was insufficient to show pretext and demonstrate discrimination); see also *Coleman*[ *v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271, 1283] (holding that to raise a triable issue of fact regarding pretext based solely on statistical evidence, the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than age'); *United States v. Ironworkers Local 86*[ (9th Cir. 1971) 443 F.2d 544, 551, footnote omitted] (holding that use of statistical evidence 'is conditioned by the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn.')." (*Gratch v. Nicholson* (N.D.Cal., Sept. 20, 2005, No. C 04-03028 JSW) 2005 WL 2290315, p. *4.)

Thus, "[a]lthough use of statistics is permissible [(in a disparate treatment case)], statistical evidence 'rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee.' *Aragon v. Republic Silver State Disposal Inc.*[, *supra*, at p. 663, fn. 6.] . . . [T]his is so because 'in disparate treatment cases, the central focus is less on whether a pattern of discrimination existed [at the company] and more how a particular individual was treated and why. As such, statistical evidence of a company's general hiring patterns, although relevant, carries less probative weight than it does in a disparate impact case.' [*Ibid.*, citing *LeBlanc v. Great Amer. Ins. Co.* (1st Cir. 1993) 6 F.3d 836, 848–49.]" (*Gratch v. Nicholson, supra*, 2005 WL 2290315 at p. *4, fn. 4.)

To some extent, then, the special interrogatories seek information arguably likely to lead to admissible evidence, although some of the information sought (e.g., descriptions of severance benefits) does not appear to be pertinent to any relevant statistical analysis. In any case, our inquiry does not end here because the information sought by the interrogatories implicates significant privacy rights of the third party employees/former employees.

*Privacy Rights*

*Pioneer Electronics* sets forth the legal principles governing our review of the privacy concerns implicated by the special interrogatories. "[T]he right of privacy protects the individual's *reasonable* expectation of privacy against a *serious* invasion. [Citation.] . . . [W]hether a legally recognized privacy interest exists is a question of law, and whether the circumstances give rise to a reasonable expectation of privacy and a serious invasion thereof are mixed questions of law and fact." (*Pioneer Electronics, supra*, 40 Cal.4th at pp. 370–371.)

■ The "analytical framework" for assessing privacy claims should proceed as follows: "First, the claimant must possess a 'legally protected

privacy interest.' [Citation.] An apt example from *Hill* [*v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633]] is an interest 'in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy") . . . .' [Citation.] Under *Hill*, this class of information is deemed private 'when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity.' [Citation.] . . . [¶] Second, *Hill* teaches that the privacy claimant must possess a reasonable expectation of privacy under the particular circumstances, including 'customs, practices, and physical settings surrounding particular activities . . . .' [Citation.] As *Hill* explains, 'A "reasonable" expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms.' [Citation.] '[O]pportunities to consent voluntarily to activities impacting privacy interests obviously affect[] the expectations of the participant.' [Citation.] [¶] Third, *Hill* explains that the invasion of privacy complained of must be 'serious' in nature, scope, and actual or potential impact to constitute an 'egregious' breach of social norms . . . . [¶] Assuming that a claimant has met the foregoing *Hill* criteria for invasion of a privacy interest, that interest must be measured against other competing or countervailing interests in a ' "balancing test." ' [Citations.] ▪ 'Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests.' [Citation.] Protective measures, safeguards and other alternatives may minimize the privacy intrusion. 'For example, if intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged.' " (*Pioneer Electronics, supra*, 40 Cal.4th at pp. 370–371.)

▪ Joyce asserts no serious invasion of privacy interests is implicated by his interrogatories. We disagree. The interrogatories effectively seek the disclosure of confidential personnel records of nonwitness third parties. The public interest in preserving confidential, personnel information generally outweighs a private litigant's interest in obtaining that information. (*Board of Trustees v. Superior Court* (1981) 119 Cal.App.3d 516, 530 [174 Cal.Rptr. 160].) "A showing of relevancy may be enough to cause the court to balance the compelling public need for discovery against the fundamental right of privacy. (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 567 [253 Cal.Rptr. 731].) However, the balance will favor privacy for confidential information in third party personnel files unless the litigant can show a compelling need for the particular documents *and that the information cannot reasonably be obtained through depositions or from nonconfidential sources.* (See *El Dorado Savings & Loan Assn. v. Superior Court* (1987) 190 Cal.App.3d 342, 346 [235 Cal.Rptr. 303].) Even when the balance does weigh in favor of disclosure, *the scope of disclosure must be narrowly*

*circumscribed."* (*Harding Lawson Associates v. Superior Court* (1992) 10 Cal.App.4th 7, 10 [12 Cal.Rptr.2d 538], italics added; see also *Alch, supra,* 165 Cal.App.4th at p. 1433 [plaintiffs abandoned their request for "sensitive information ordinarily found in personnel files, such as evaluation of the person's work . . . , income information, employment contracts and the like"]; cf. *Britt v. Superior Court* (1978) 20 Cal.3d 844, 855–864 [143 Cal.Rptr. 695, 574 P.2d 766] (*Britt*) [even party plaintiffs could not be compelled to provide information about all their political activities or their entire medical histories; party seeking discovery must show both compelling need for the information and that discovery request is narrowly and specifically drawn to minimize intrusion into private matters].)

■ As Joyce points out, the importance of "eradicating discrimination and retaliation in the workplace and providing a remedy to employees when such occurs" is a compelling public policy, codified in the FEHA statutes. But, as noted, that public policy must be weighed against the privacy interests involved. Here, the trial court failed to separately analyze the several categories of information sought by the interrogatories, and "to consider whether a more nuanced approach to the different categories of data would satisfy the balance that must be taken between privacy interests and a litigant's need for discovery." (*Alch, supra,* 165 Cal.App.4th at p. 1422.) This, alone, is reason to issue a writ and return the matter to the trial court.

We further observe that, while Joyce points out he must make a statistical showing in connection with his disparate impact claim, there is no apparent reason on this record why he cannot obtain the necessary raw data from LTC in a form that would not disclose individual-specific confidential information. Although Joyce will be required to demonstrate the reliability of any statistical evidence he presents (*Ortega v. Safeway Stores, Inc.* (10th Cir. 1991) 943 F.2d 1230, 1243), nothing in the record at this stage of the case supports his speculation LTC will not supply accurate data. There also is nothing in the record that explains why Joyce needs data of the breadth he seeks, particularly given the focus of a statistical analysis for disparate impact purposes.

■ The interrogatories also seek employee/former employee residential addresses and telephone numbers. "Courts have frequently recognized that individuals have a substantial interest in the privacy of their home." (*Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 359 [99 Cal.Rptr.2d 627] (*Planned Parenthood*).) Joyce asserts "there is no other way to obtain percipient witnesses contact information." But, again, nothing in the record suggests all of the employees/former employees as to whom contact information is sought were witnesses to the discriminatory and retaliatory acts he allegedly suffered. (Cf. *Puerto v. Superior Court* (2008) 158

Cal.App.4th 1242 [70 Cal.Rptr.3d 701] [names and contact information authorized for individuals identified by defendant as percipient witnesses].)[5]

Nor are these employees/former employees potential class members who previously self-identified. (Cf. *Pioneer Electronics, supra,* 40 Cal.4th 360.) Indeed, the Supreme Court framed the issue in *Pioneer Electronics* as: "Does a complaining purchaser possess a right to privacy protecting him or her from unsolicited contact by a class action plaintiff seeking relief from the vendor to whom the purchaser's complaint was sent?" (*Pioneer Electronics, supra,* 40 Cal.4th at pp. 365–366.) The third party employees/former employees whose personnel information is sought by Joyce have not placed themselves in a comparable situation. Other recent class action cases are also on a distinctly different footing and do not support the sweeping disclosure of individual-specific confidential information sought here. (E.g., *Crab Addison, Inc. v. Superior Court* (2008) 169 Cal.App.4th 958, 965–975 [87 Cal.Rptr.3d 400]; *Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325, 1336–1338 [83 Cal.Rptr.3d 241] [observing contact information regarding the identity of "potential class members" is "generally discoverable"; putative class members are also, by definition, witnesses to the allegedly wrongful conduct].)

As for the interrogatories seeking severance package information, the features of the Special Severance Plan were publicized throughout the company, including the criteria by which an employee would or would not receive a severance package. Accordingly, the record indicates Joyce does not need private information from individual personnel files to support his claim that he was denied such benefits in retaliation for his complaints of age discrimination.

In sum, the interrogatories are in some respects overbroad and in other respects seek private and personal information without a sufficient showing of compelling need for it.

In addition, the trial court failed to provide sufficient procedural safeguards in connection with the ordered disclosure. In *Pioneer Electronics,* for example, the company, not the plaintiffs' attorney, was the party directed to give notice to putative class members (a status not shared by the third party employees/former employees here) of "important limitations, requiring written notice of the proposed disclosure to all complaining Pioneer customers, giving them the opportunity to object to the release of their own personal identifying information." (*Pioneer Electronics, supra,* 40 Cal.4th at p. 373.) In *Alch,* notice to putative class members included a simple objection form

---

[5] Even as witnesses, they would be entitled to privacy protections. (*Pioneer Electronics, supra,* 40 Cal.4th at p. 373; *Planned Parenthood, supra,* 83 Cal.App.4th 347.)

"on which recipients could object to the disclosure of all or specific categories of information, and a list of frequently asked questions and corresponding answers. The notice advised recipients that a motion could be filed to overrule any objection. It also advised that a court order would restrict use of and access to the requested records, which would be made available only in connection with the litigation." (*Alch, supra,* 165 Cal.App.4th at p. 1418.) Thereafter, objectors were sent a second notice notifying them that the party requesting the information "intended to move to overrule their objections, and advising them of their rights to respond to the . . . motion in writing and at a hearing." (*Ibid.*)

Had Joyce sought the information at issue here by way of a deposition subpoena, instead of through interrogatories, he would have been required to cause a copy of the subpoena duces tecum to be served on the employees/former employees, as well as the declaration in support of the subpoena, along with a detailed privacy notice. (Code Civ. Proc., § 1985.6, subds. (b)–(e).) A nonparty employee/former employee could thereafter "serve on the subpoenaing party, the deposition officer, and the witness a written objection that cites the specific grounds on which production of the employment records should be prohibited." (Code Civ. Proc., § 1985.6, subd. (f)(2).) "No witness or deposition officer shall be required to produce employment records . . . after receipt of a written objection from a nonparty employee, except upon order of the court in which the action is pending . . . ." (Code Civ. Proc., § 1985.6, subd. (f)(3).) We do not believe a nonparty employee/former employee should be deprived of such protections simply because the discovery vehicle used is a set of special interrogatories, rather than a subpoena duces tecum.

The trial court also failed to make any provision for maintaining the confidentiality of any disclosed information, by sealing it and/or limiting its use and dissemination. (See *Pioneer Electronics, supra,* 40 Cal.4th at p. 371 ["[p]rotective measures, safeguards and other alternatives may minimize the privacy intrusion"]; *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] [appropriate confidentiality and sealing orders].)

■ We therefore conclude the trial court abused its discretion in ordering further answers to the challenged special interrogatories. The court failed to evaluate, with regard to each category of information requested by Joyce, whether a compelling need for the information outweighs the third parties' privacy interests, taking into consideration whether less intrusive means exist for Joyce to obtain the information he seeks. (See *Britt, supra,* 20 Cal.3d at pp. 855–864; *Harding Lawson Associates v. Superior Court, supra,* 10 Cal.App.4th at p. 10; *El Dorado Savings & Loan Assn. v. Superior Court,*

*supra*, 190 Cal.App.3d at p. 346.) The court also failed to provide sufficient notice to the third party employees/former employees affording them a simple, reasonable means of objecting to the disclosure of their personal information, and failed to provide for the protection of any such information ultimately ordered disclosed. (See *Alch, supra*, 165 Cal.App.4th at p. 1418; cf. Code Civ. Proc., § 1985.6, subds. (b)–(f).)

## IV. DISPOSITION

Let a peremptory writ of mandate issue commanding respondent Superior Court of San Mateo County to set aside that portion of its order filed February 2, 2011, in *Joyce v. Life Technologies Corp.* (Super. Ct. San Mateo County, No. CIV494692) granting Joyce's motion to compel responses to special interrogatories Nos. 2–10, 59 and 62 and to, instead, reconsider the motion in light of our opinion.

The stay previously imposed shall remain in effect until the remittitur issues.

Petitioner, LTC, shall recover its costs.

Marchiano, P. J., and Margulies, J., concurred.